# Richmond

## CAMPBELL V. ALSOP'S ADMINISTRATOR

March 12, 1914.

Absent, Cardwell, J.

1. CONTRACTS—*Delay in Performance—Rescission—Forfeiture.*—A widow having, by a valid written contract, supported by a valuable consideration, and also induced by natural love and affection, agreed with her nephew that, upon her death, she would give to him all her property and personal effects, a court of equity will not, at the instance of her next of kin—there being no debts—declare a forfeiture of his rights under the contract simply on account of explainable delay in carrying out some of its provisions, especially where she never by words or acts intimated a wish or purpose to be released from the contract on account of such delay.

2. CONTRACTS — *Delayed Performance — Rescission—Forfeiture.*—In the absence of bad faith a court of equity is not astute to search for grounds of forfeiture. Nor will it rescind a contract for mere delay in performance where the party in interest has, *ad interim*, accepted substitutionary performance.

3. COVENANTS—*Modification by Subsequent Parol Agreement.*—In equity, covenants or contracts under seal may be modified by subsequent parol agreements as well as other written instruments.

4. EXECUTORS AND ADMINISTRATORS—*Action to Recover Estate—When Relief Granted to Defendant.*—A court of equity, with all parties before it, and having control of a fund the ultimate destination of which is plainly in sight, will decree the fund to the parties ultimately entitled thereto, and will not relinquish the administration of a fund on the theory that it is an asset of an estate to the administration of which a personal representative before the court is exclusively entitled. If there are creditors of a decedent who are entitled to priority over a beneficiary in possession, the court may treat the latter as

an executor *de son tort* and require him to discharge such liabilities out of the assets in his hands.

Appeal from a decree of the Circuit Court of Caroline county. Decree for the complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*St. George R. Fitzhugh* and *William E. Ennis,* for the appellant.

*Chandler & Beale,* for the appellee.

WHITTLE, J., delivered the opinion of the court.

The original bill in this case, filed by the appellee, R. B. Broaddus, administrator of the estate of Sarah S. Alsop, deceased, against the appellant, T. R. Campbell, alleged that the defendant had tortiously and illegally taken possession of all the personal property of the decedent and converted it to his own use; that plaintiff, as administrator, had brought an action of trover against the defendant to recover damages for the illegal seizure of the assets, which action was then pending on the law side of the court; that plaintiff was unable to properly describe the specific articles of personal property in the possession of the defendant, or to prove their value without an appraisal: and that the defendant had denied the appraisers access to the property. The bill prayed that the defendant might be enjoined from interfering with the appraisers in the discharge of their duties and also from disposing of the property, and that he be required to give bond for its production to answer such judgment as might be rendered against him in the action at law.

The defendant in his answer to the original bill, which was treated as a cross-bill, showed that on August 26, 1910, he entered into a valid written contract with his aunt, Mrs. Sarah S. Alsop, by the terms of which at her death he became the absolute owner of the property in controversy; that after her death, and before the qualification of the plaintiff as administrator, he removed the property to his home in Caroline county; that decedent owed no debts; and that he had paid her doctor's bills and funeral and other expenses. He explained in detail the circumstances which led up to and culminated in the execution of the contract, and insisted that there was no necessity for turning this property over to the plaintiff for administration. The prayer of the cross-bill was that the court would decree that respondent was the true owner of the property, and enjoin the administrator from prosecuting the action at law, and for general relief.

Depositions were taken to sustain the allegations of the cross-bill, and from a decree dissolving an injunction theretofore awarded respondent (but without prejudice to his right to recover damages at law, if any he had sustained, on account of his contract) and dismissing the original bill and cross-bill at his costs, this appeal was granted.

In outline, the salient facts are these: Mrs. Alsop was a widow and had no living child, and at the date of the contract was sixty-four years old. During the lifetime of her husband they lived on his home farm in Spotsylvania county. After his death, which occurred about twenty years before the commencement of this litigation, dower, including the mansion house, was assigned her in the farm, and she continued to live there until her death, which occurred on September 30, 1911. Her entire estate consisted of the dower interest in the farm

and something less than two hundred dollars in value of household effects. Subject to this dower interest, the farm belonged to two sons of her late husband by a former marriage. Her next of kin were a number of nephews. These nephews, with the exception of appellant, had never shown any regard for their aunt, and practically stood in the relation of strangers toward her. On the other hand, her affection for appellant was as tender as that of a mother for a dutiful son, and was fully reciprocated by him. Appellant lived in the adjoining county of Caroline, and was possessed of a landed estate estimated to be worth more than twenty thousand dollars. Throughout Mrs. Alsop's widowhood he manifested the deepest solicitude for her welfare and comfort, and she looked to him alone for counsel and protection. He visited her frequently, and, without promise or hope of reward, for years from his own individual means contributed materially to her support and maintenance. Her step-sons had long pressed her to sell her dower interest to them for $500, which was a grossly inadequate price. At times she seemed disposed to make the sale, but was restrained by the earnest advice of her nephew, who insisted that she ought not to sell the property for less than $1,500. On March 4, 1907, she wrote him that her step-sons were again urging her to sell her interest, and said: "I wish I could get a home with you, if I sell out. Let me know if I can." Appellant in reply to that letter, after urging her in the most earnest manner not to sell at their offer, adds: "Note that you say that you wish you could get a home with me, if you sell out; I have told you before that you could whether you sell or not if the house that I can give you will suit you." Again on April 30, 1910, she wrote that the Alsops had offered her $1,400, which she thought she would take, and said: "You had best build the house." In her next

letter of July 6, 1910, she writes: "I have sold out to Dr. George Alsop, you say that you will give me one or two rooms. Just build one room on to your house so that I will not be alone or build a house just as you like."

In his reply of July 10, 1910, appellant says: "Note that you want me to move you as soon as I can. There is a house here that you can move into at any time, but it would not hold a fourth of your furniture. I have a good two-story house at the grist-mill, but it has a tenant in it for this year, but I will give him moving orders for another year, and if you want me to put this in good order I will do so and move you into that."

These letters were followed by the contract of July 26, 1910, which after reciting that Mrs. Alsop had sold her dower interest in the Alsop estate and would have to surrender possession during that year, and would either have to buy another place, or board with some one or live with some of her relatives or friends; and since her nephew, T. R. Campbell, had no house on his place suitable for her to go into and have a home with him, it was mutually agreed between them that they would build a house at his old home place and occupy the same together; that he would build the house as soon as possible, he supplying the lumber and she agreeing to furnish $300 at that time and $100 later on, if needed, that being the estimated cost of the woodwork. The cost of bricks or the brick work would constitute an extra charge. The object of the contract was declared to be to show the good faith of the parties, and what each was to contribute toward the building. As further evidence of Campbell's good faith in carrying out his agreement to build the house, he gave Mrs. Alsop his note for the $300 then advanced, and for the further sum of $100.00, if the same should be needed and had to be paid, as a guaranty in case he should die before the house was

built, but when built the notes were to be destroyed. He further agreed that Mrs. Alsop could have a home with him as long as he lived and that he would take the best care of her he could and in the event that he should die before she did, she should continue to make the house her home, and be provided for out of his estate. The contract then proceeds as follows:

"Now it is further agreed by Mrs. Sallie B. Alsop . . that her nephew T. R. Campbell . . has shown by previous acts and evidences of his love and esteem for her, and also shown by this instrument of writing that he has her welfare and individual interest at stake, and has further shown heretofore that of all her kinspeople he is the only one that has cared anything for her, or has taken any interest in her, in the event that she should die before he did, she will give to him for the above and other considerations all her property and personal effects. It is hereby agreed . . that the said T. R. Campbell can have the use of her furniture, etc., provided he will come up and move same, which he agrees to do."

It will be observed that the considerations which moved Mrs. Alsop to enter into this contract were not confined to the stipulations on the part of Campbell to unite with her in building the house, and to support and maintain her during his life and charging his estate with her support after his death. The contract also recites, "for other considerations," and in the light of the evidence it cannot be doubted that she classed among these "other considerations," his uniform love and affection and generous contributions to her support covering years of her widowhood, which ministrations continued to the date of the contract.

After the sale of her dower, an arrangement was made with the tenant of the purchaser that she should con-

tinue to occupy a room in her former home, and this agreement remained in force until her death, Mr. Campbell paying the rent and furnishing her with family supplies. About two weeks before her last illness, she and her nephew decided that she should move with her effects into a house he had built for his miller on his farm in Caroline county. He had made arrangements with the depot agent near her former home to ship her effects, and had sent boxes to the station in which they were to be packed, the tenant agreeing to do the hauling; but shortly before that arrangement was accomplished she was seized with sudden illness from which she died. She suffered two strokes, but so far rallied from the first that the doctor named a day when he thought she would be well enough to move; but the first stroke was followed by a second from which she never recovered. Her nephew visited her during her illness, and employed a nurse to wait on her and paid all expenses.

The circuit court treated the case as a suit for specific performance of the contract, and denied relief to appellant on the sole ground that his tardiness in building the house had deprived Mrs. Alsop of the enjoyment of "any of the things she had contracted for." This view, as it seems to us, obscures the real issue in the case. Before this litigation arose—nay, even before the qualification of appellee as administrator, the case had passed the stage which called for affirmative action on the part of appellant, and by the stipulations of the contract the subject-matter of the litigation had reached its ultimate destination. Therefore, the controlling question, in light of all the facts, was whether or not a court of equity should declare a forfeiture of appellant's rights under a contract which was self-executing at Mrs. Alsop's death, so far as investing him with title to the

property was concerned —a forfeiture not invoked in the interest of creditors, but of her next of kin, and merely upon the hypothesis that he had been tardy in performing one of the stipulations of the contract. His good faith throughout the transaction is conceded. He had assembled the necessary lumber and bricks for erecting the house, and had discussed the plans and cost of building it with a practical builder in whom he had confidence. Moreover, it is a reasonable inference from the evidence that the work of construction was only temporarily postponed because the contractor at that time had some other jobs on hand, and that the house would ultimately have been built but for Mrs. Alsop's unexpected illness and death. Certain it is that she never by word or act intimated a wish or purpose to be released from the contract on account of delay in building the house. It is true she yearned for the time to come when she might spend the declining years of her life with her nephew; yet her wishes were consulted, and she acquiesced in the temporary provision made for her comfort until a permanent home could be provided.

In the absence of bad faith a court of equity is never astute to search for ground of forfeiture. Nor can any authority be found for rescinding a contract for mere delay in performance when the party in interest has. *ad interim,* accepted substitutionary performance. 2 Elliott on Contracts. sec. 1654; 3 Elliott on Contracts. secs. 1858, 1866. See note to *Harris* v. *Murphy,* 56 Am. St. Rep. 656. treating the general subject of modification, etc., of written contracts by subsequent parol agreement—That in equity the rule applies to covenants or contracts under seal as well as to other written instruments. see p. 670.

In *Turner* v. *Citizens Bank,* 111 Va. 184. 192. 68 S. E. 407, 409 the court, at p. 19, quotes approvingly from

Pomeroy's Eq. Jur. (2nd ed.), sec. 109, as follows: "Equitable remedies . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties."

The court in that case met the insistence of the administrator to have certain assets of his decedent turned over to him for administration by holding, that "A court of equity with all parties before it, and having control of a fund the ultimate destination of which is plainly in sight, will decree the fund to the parties ultimately entitled thereto, and will not relinquish the administration of the fund on the theory that it is an asset of an estate to the administration of which a personal representative before the court is exclusively entitled."

If it had been made to appear that there were creditors of the estate of Mrs. Alsop who were entitled to priority over appellant with respect to the property, the court might well have treated him as an executor *de sen tort.* and required him to discharge such liabilities out of the assets. But, as we have seen, the estate was not indebted, and appellant's title to the property and the possession thereof ought to have been sustained.

For these reasons we are of opinion that the decree of the circuit court must be reversed, and this court will enter a decree in accordance with the views expressed herein.

*Reversed.*