**In the Matter of Julian George MURPHY, Bankrupt.**

**UNION MUTUAL LIFE INSURANCE COMPANY for its own use and for the use of The Continental Insurance Company, Plaintiff,**

v.

**Julian George MURPHY, and H. Bradley Evans, Jr., Trustee, Defendants.**

**Bankruptcy No. 78–873–A.**

United States Bankruptcy Court,
E. D. Virginia,
Alexandria Division.

Feb. 17, 1981.

Lionel Richmond, Fairfax, Va., John C. Somers, Woodbridge, Va., for defendant.

Robert L. Ellis, Arlington, Va., for plaintiff.

H. Bradley Evans, Jr., Alexandria, Va., trustee.

Thomas H. McGrail, Washington, D. C., for use-plaintiff, Continental Insurance Co.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

The plaintiff, Union Mutual Life Insurance Company, and a subsidiary plaintiff, Union Mutual Stock Life Insurance Company (plaintiffs "Union Mutual") issue insurance in the greater metropolitan area of the District of Columbia. The defendant, Julian George Murphy ("Murphy"), was a broker engaged with Union Mutual over a period of time prior to 1977. The defendant entered into an Agent's Contract, dated December 16, 1976. This contract was executed by the Wechsler Company, Inc., as General Agent, on behalf of Union Mutual. The use plaintiff, Continental Insurance Company ("Continental") issued "an insurance companies blanket bond" whereby Continental agreed to indemnify Union Mutual against losses caused by dishonesty or fraud, subject to a $1,000.00 deductible.

The parties stipulated that premiums received by the defendant but not remitted to Union Mutual, as of the date of his termination with the company in November 1977, totalled $63,780.37, which included the sum of $1,000.00 for the deductible loss suffered by Union Mutual. The parties also stipulated to the sum of $1,194.50 for expenses incurred by Continental. The combined amount of these sums equals $64,974.87. The parties did not stipulate as to the sum credited by Union Mutual to the defendant's renewal commission account.

Union Mutual and Continental allege that during the period 1976 to 1977 the defendant, acting as either an agent or broker for Union Mutual, did collect and receive premiums from individual doctors who were members of the District of Columbia Medical Society ("DCMS") insured by Union Mutual. The defendant allegedly failed to forward these collected premiums to Union Mutual. Union Mutual submits that the defendant knowingly and willfully used these collected premiums to satisfy business overhead and personal expenses (unauthorized by Union Mutual) fully cognizant of the fact that these premium monies rightfully belonged to Union Mutual.

The plaintiffs seek relief under Section 17(a) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2), (4), and (8). The plaintiffs also request that this Court enter a judgment against the defendant in the stipulated amount of $64,974.87; and that the defendant's rights, if any exist, to insurance premium commissions, accrued or prospective, be declared forfeited.

The facts, as adduced at trial, are as follows:

Paul Wechsler, General Agent for Union Mutual, discussed with the defendant the possibility of developing a market strategy for issuing a "Professional Overhead Disability Contract" to the member doctors of DCMS. The defendant testified that as initially envisioned, he was to collect the first policy premiums and forward them to Union Mutual. All renewal premiums were to be collected by Union Mutual. Following the receipt of renewal premiums by Union Mutual, commissions on these premiums would be paid to the defendant.

On February 11, 1974, a new procedure for remitting renewal premiums was adopted by Union Mutual. This revised collection procedure called for a "list bill" to be established whereby the defendant would collect all renewal premiums and make a periodic remittance to Union Mutual. All premiums under this procedure were to be made payable as of March 15, 1974, by the insureds on an annual basis. Separate list bills were subsequently established to accommodate those insureds who desired to be billed on a semi-annual or quarterly basis.

The defendant acknowledged that although Union Mutual had issued a general information memorandum on the list bill procedure, it was he who contacted Union Mutual and requested an opportunity to make use of this procedure. An agent using a list bill procedure incurred several advantages over agents who did not have this procedure available to them. First, all insureds under such a plan would receive a ten percent discount from the normal premium. The defendant admitted that doctors in general were dollar conscious be-

cause of their unusually high insurance rates, and an agent who could provide comparable coverage for less money would have a decided edge over the competition. Such a list bill procedure would also provide DCMS with an organized plan directed by a local administrator in close contact with the insured doctors of the society. Wechsler related in his testimony that the defendant felt such a procedure would lend "prestige to the fact that he was the administrator."

The defendant testified that it was he who determined which doctors were to be placed on the annual, semi-annual or quarterly list bills. He testified further that by 1975 (theoretically, at least) he was aware of what the doctors' premium costs would be on the various list bills.

There exists some controversy as to why the defendant executed the Agent's Contract. The defendant contends that Wechsler enticed him to give up his broker status with Union Mutual by promising him full support in securing additional business with DCMS. The defendant testified that although he finally acquiesced to Wechsler's entreaties, the promised new business never materialized.

Wechsler testified that he believed the defendant initiated the discussions about becoming a career agent, and that such a change in the defendant's status was was mutually agreeable. Wechsler also testified as to the numerous benefits encompassed in the Agent's Contract that were unavailable to the defendant as a broker. These benefits included: a free noncontributory pension plan; a free medical plan; expense-free conventions, free stationery; enhanced prestige with DCMS as Union Mutual's representative; and higher commissions.

The defendant related that although a career agent did receive a higher commission rate, if he left the company after three or four years, all future renewal commissions would be forfeited. Under his Broker's Contract, however, these renewal commissions would remain vested even if he, as a broker, left the company.

After a thorough review of the record, the Court finds that the evidence adduced at trial does not substantiate the defendant's proposed findings of fact that Union Mutual or Wechsler coerced the defendant into becoming a career agent in order to preclude the defendant from collecting commissions.

On several occasions the defendant was delinquent in remitting premiums to Union Mutual. The defendant also occasionally wrote checks drawn from his business account for the purpose of remitting premiums which were returned by drawee banks as a result of insufficient funds in his business account.

The weight of the evidence indicates that representatives of Union Mutual exchanged correspondence with the defendant and met with him on numerous occasions in an effort to resolve the defendant's difficulty in properly remitting premiums. Testimony was given to the effect that the defendant led Union Mutual to believe that this problem was attributable to late receipt of payments from insureds, delays in receiving billing lists from Union Mutual, administrative difficulties, bookkeeping problems and bank errors.

Gilbert Broburg, a supervisor for Union Mutual, testified that in February of 1977 he became aware that the defendant was having some difficulties in the list bill procedure with DCMS. As a result of his investigation, Broburg wrote a letter, dated February 8, 1977, to Wechsler's administrative assistant, Joanne Santani, with a copy to the defendant. Broburg pointed out that "checks remitted for premium payment should come directly from the client and not be written on the agent's account." He also stated in the letter that delinquent payment of premiums could not continue.

During the course of a meeting between the defendant, Wechsler and John Serbin (second vice-president for Union Mutual) held in Philadelphia, Pennsylvania, on April 12, 1977, the defendant acknowledged that he was commingling premium monies with other business and personal funds, according to Wechsler. Wechsler testified that Serbin directed the defendant to immedi-

ately establish a new account which was only to be used to receive premium monies from the insureds under the DCMS list bills. Serbin corroborated Wechsler's testimony on this point and added that no personal checks were to be written on this account. Both Wechsler and Serbin testified that the defendant informed them that he had already taken steps to correct the problem by setting up a separate account.

The Court is unpersuaded by the defendant's testimony that Serbin only suggested that a separate account be set up. The weight of the evidence strongly suggests that the defendant was directed to keep his premium accounts current and the funds therein were to be segregated from all other monies.

In September 1977, Broburg testified that he received a list bill statement from the defendant which listed as payable to Union Mutual the sum of $14,000.00. However, no check was appended to this statement. The testimony is conflicting as to the whereabouts or even the existence of this check. During the course of an audit of the defendant's books and records, Broburg testified that he saw the $14,000.00 check in the defendant's checkbook, marked "void". He later acknowledged that although he believed the check itself was marked void, rather than the check stub, he could not absolutely be sure.

The defendant remitted a check to Union Mutual drawn on his business account in the sum of $27,033.57 and dated August 26, 1977. This check subsequently was returned toward the end of September 1977 for insufficient funds. After being redeposited by Union Mutual the check again was returned for insufficient funds.

Broburg and an auditor for Union Mutual, one Tim McInerney, were directed to audit the defendant's books and records. Broburg testified that this audit revealed that although the defendant was in receipt of premium monies from the insureds under the DCMS list bills, he had not remitted these monies to Union Mutual.

The final audit sheet prepared by Broburg and McInerney amply demonstrates that defendant was billing many of the insureds under the DCMS list bills on a mode of payment different from the billing mode made known by him to Union Mutual.

For example, the final audit sheet in case No. 2988 shows a comparison between the defendant's records and those of Union Mutual as to one insured, Louis Adkinson. Union Mutual's records indicated that Adkinson was on a quarterly payment mode with $221.44 being payable each quarter. The defendant's records, however, indicated that Adkinson was being billed on an annual mode in the sum of $851.70. The audit sheet indicated that under Adkinson's annual mode payment schedule there existed a suspended debit of $638.78 that had not been remitted to Union Mutual. Broburg's testimony reveals that this example was representative of the majority of the cases examined in the audit, and there was a total sum in excess of $62,000.00 as a suspended debit in the insureds' accounts.[1]

Broburg testified that other shortages existed in monies owing to Union Mutual. Numerous policies were in arrears. An inquiry was directed to the insureds who were requested to provide documentation as to the status of their policy payments. A large number of insureds provided Union Mutual with photocopies of cancelled checks showing their policy payments to be current. Broburg further testified that an additional $2,900.00 had not been remitted by the defendant to Union Mutual.

Tim McInerney testified that during the course of the audit of the defendant's records he examined the check stubs in the defendant's checkbooks. In his examination, McInerney only noted those items which he could construe as personal and not business related. He also examined the defendant's commission earnings which amounted to about $29,000.00.

1. The parties stipulated not only to the accuracy of the November 1977 audit but also that the "suspended debit" sums accurately represent the balance due from funds collected from the insureds and not remitted to Union Mutual.

As a result of his audit, McInerney determined that the defendant drew $23,400.00 for personal expenses; $13,000.00 for expenses on the defendant's farm; and $5,700.00 for miscellaneous bills, (e. g., car payments, house mortgage payments, etc.). On the date of the audit, November 3, 1977, McInerney testified that the balance in the account amounted to only about $400.00.

Union Mutual filed with the use plaintiff, Continental, a proof of loss due to the defendant's alleged misappropriation of monies which was covered by a blanket bond. The use plaintiff indemnified Union Mutual in the sum of $62,780.37.[2]

Section 17(a)(4) of the Bankruptcy Act provides that a bankrupt shall not be discharged from those debts which were "created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity." In order to find relief in this provision, Union Mutual must establish that the defendant owed a fiduciary duty to Union Mutual and that the defendant breached this fiduciary duty. *Consumers Life Insurance Co. v. Staller*, 4 B.C.D. 328, 330 (Bkrtcy.D.N.J. 1978).

■ The Court is of the opinion that a fiduciary relationship existed between the defendant and Union Mutual. The Fifth Circuit in *United States v. Kreimer*, 609 F.2d 126 (5th Cir. 1980) expressed the view that although the duty of an insurance agent to the insurer may not be the same as that demanded of trustees, there does exist a duty of fidelity which is fiduciary in nature. It is clear, however, that a constructive trust is not sufficient to create a "fiduciary relationship" under the Bankruptcy Act forbidding the discharge of debts created by fraud or misappropriation while acting in a fiduciary capacity. *Angelle v. Reed, et al.*, 610 F.2d 1335 (5th Cir. 1980). The scope of the concept "fiduciary" under the exception to discharge provisions of the Bankruptcy Act is a question of federal law. *Id.* at 1341.[3]

■ A fiduciary under the Bankruptcy Act has been "defined as one being limited to technical or express trusts and is not applicable to agents" *Fidelity and Deposit Company of Maryland, Inc. v. Lilly*, 1 B.R. 773, 774 (Bkrtcy. D.Md.1980); unless the complainant establishes "some additional fact." *In re Harrill*, 1 B.R. 76, 80 (Bkrtcy. E.D.Tenn.1980). The express agreement of "trust must have existed independent of and prior to the conduct which trigger[ed] the operation of a trust *ex maleficio.*" *Middlesex Insurance Co. v. Koritz*, 2 B.R. 408, 415 (Bkrtcy. D.Mass.1979).

■ It is well established that a fiduciary relationship will be imposed when the individual insurance agent enters into an explicit agreement with the insurance company wherein an express trust relationship is contemplated as between the parties. *E. g., Maguire Company v. Herzog*, 421 F.2d 419 (5th Cir. 1970), *Morgan v. American Fidelity Fire Insurance Co.*, 210 F.2d 53 (8th Cir. 1954). Such a fiduciary relationship certainly will be imposed when the agent is found to have "obtained a pecuniary benefit by retention of" premium funds. *Middlesex Insurance Co. v. Koritz, supra*, 2 B.R. at 416.

---

**2.** The use plaintiff, Continental, is subrogated to all rights of Union Mutual to the extent of its disbursements. After an employer has been made whole on his loss caused "by the wrongful acts or conduct of a bonded employee, the surety or insurer on a fidelity bond is subrogated pro tanto to any right of action which the employer may have against the defaulting employee." 35 Am.Jur.2d, *Fidelity Bonds and Insurance*, § 101 (1967).

**3.** The Supreme Court has defined narrowly what constitutes the applicable definition of a "fiduciary" under Section 17(a)(4) of the Bankruptcy Act. *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236 (1844); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). The concept of "fiduciary" is limited to technical trusts. As stated in the Fifth Circuit in *Angelle*, state law may be referred to in determining when a trust exists. In a situation when a statutory trust-like obligation is imposed "the trust must arise prior to and without reference to the act creating the debt." *Angelle v. Reed, et al., supra*, 610 F.2d at 1341.

■ In the instant matter, it is uncontroverted that the Agent's Contract entered into by the defendant with Union Mutual contemplates that:

"[The defendant] will hold in trust all monies and documents belonging to the Company that are in his possession and promptly remit them to the General Agent or Company as required by the rules, instructions and regulations of the General Agent or Company."

Pursuant to the terms of the Agent's Contract, the defendant was to hold the premium monies as a trustee until such funds were remitted to Union Mutual. At trial, the defendant acknowledged he understood that he was to act in a fiduciary capacity with respect to the premium monies.

The defendant places great reliance on two Supreme Court decisions, *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); and *Noble v. Hammond*, 129 U.S. 65, 9 S.Ct. 235, 32 L.Ed. 621 (1889). The facts in these cases are readily distinguishable from the instant matter inasmuch as *Davis* and *Noble* involved an interpretation of trusts which were implied from a contractual and accommodation relationship, respectively, rather than technical or express trusts created by contract.

■ Having determined that there exists a fiduciary relationship between the defendant and Union Mutual, the Court must next determine whether the defendant has breached his fiduciary duty. It is again uncontroverted that the defendant received premium monies from the DCMS insureds and failed to remit these funds to Union Mutual. However, only that breach of fiduciary duty which involves serious misconduct will be construed as coming within the meaning of " 'fraud, embezzlement, misappropriation and defalcation.' " *Middlesex Insurance Co. v. Koritz, supra*, 2 B.R. at 417.

■ A review of the cases which have dealt with this issue reveal four elements variously taken into consideration by the courts. These elements include: whether the agent converted insurance premiums in his custody for personal use; whether the agent was required to establish a separate trust account for the benefit of the insurer; whether the agent disregarded the trust provisions of the written agreement and the insurer acquiesced in his conduct contrary thereto; and whether the acts involving the agent's breach of fiduciary duty constitute fraud, embezzlement, misappropriation or defalcation.

The court in *Middlesex Insurance Co. v. Koritz, supra*, 2 B.R. at 416, in finding the defendant insurance agent's debt to be dischargeable, relied heavily upon the fact that the agent was not personally designated by the insurance company to collect premiums individually, nor was it found that "he individually benefited or used [the premiums] for personal gain."

■ It is clear that the defendant was personally held responsible by Union Mutual to collect the premiums from the insureds. This was the purpose of the list bill procedure.

The defendant acknowledged that he alternately used two checking accounts, one with the Union First National Bank of Washington, the other with the National Bank of Fredericksburg. He explained that when a check would bounce on one account he would use the other account until the first account straightened itself out. He testified that in December 1976 he placed $5,000.00 of a $19,000 loan he received on an advance from a mortgage broker on his home into an account later audited by McInerney and Broburg. McInerney testified that he had no recollection of any such funds having been placed in the account as a result of a mortgage from any property, or a check from a mortgage company.

There was testimony that a portion of the monies in the account was used for business-related purposes in expanding Union Mutual's business was DCMS. In oral argument before this Court, counsel for the defendant acknowledged that some of the unaccounted funds did go elsewhere.

In response to the defendant's assertions, Union Mutual counters that in his capacity as either a broker or an agent, the defendant was personally responsible for all of his business-related expenses. The defendant was given a $10,000.00 expense allowance by Wechsler to assist him in establishing the list bill procedure. The evidence is clear that the defendant was an independent agent who also handled insurance for companies other than Union Mutual. He acknowledged that doctors with DCMS sent him one check for policies with other insurance companies that the defendant had sold to them. This required the defendant to write three hundred or four hundred checks a year. Defendant admitted that, in retrospect, this was a serious error on his part.

Wechsler testified that during the course of his meeting with the defendant on October 26, 1977, the defendant told him that he "just [did not] have the money to pay the bills."

Evidence adduced at trial establishes that the defendant commingled monies from premiums due and owing Union Mutual with monies due other insurance companies and personal funds. He withdrew monies from the account to meet business overhead expenses and personal expenses. The weight of the evidence strongly suggests that the defendant was directed and agreed to establish a separate account for premium monies received from insureds with DCMS. Furthermore, these funds were to be immediately turned over to Union Mutual. The defendant, in direct contravention of this, did not establish such a separate account.

The defendant suggests that Union Mutual acquiesced to his accounting practice of submitting late checks and of commingling funds. Union Mutual acknowledges that the defendant's practice of making late payments was known to the company and that some of the checks did not clear the first time they were sent through by Union Mutual. However, there is strong evidence to the effect that Union Mutual admonished the defendant to cease this practice forthwith.

By its very nature, acquiescence demands knowledge of a particular situation by the party allegedly acquiescing to another's actions to the detriment of that party. The record demonstrates that had the defendant not been delinquent in payment of premiums to Union Mutual and had the $14,-000.00 and $27,000.00 checks cleared the drawee banks in August and September 1977, Union Mutual's records would have indicated that the defendant was current on his premium remittances. There is also substantial evidence in the record that Union Mutual had no knowledge of the defendant's practice of billing insureds on billing modes different from those modes of billing made known to him by Union Mutual. Nor does it appear that Union Mutual was aware of the defendant's practice of remitting premium monies from insureds other than those insureds who had submitted their premium checks to him when due for payment on their policies. Serbin and Wechsler stated categorically that they did not authorize or acquiesce to any use of premium funds due Union Mutual by defendant for the purpose of financing his business operations or for his personal use.

The Supreme Court in *Moore v. United States*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895), defined embezzlement as the appropriation of property in a fraudulent manner by a person to whom such property was entrusted. Some degree of dishonesty is implicit in the meaning of either embezzlement or fraud. "[M]isappropriation must be due to a known breach of duty, and not to mere negligence of mistake." *In re Bernard*, 87 F.2d 705, 707 (2d Cir. 1937). Defalcation has been given the broadest meaning and interpretation involving the least amount of misconduct. *Consumers Life Insurance Co. v. Staller, supra*, 4 B.C.D. at 331. Thus, "[w]hen a fiduciary takes money upon a conditional authority which may be revoked . . . he is guilty of a 'defalcation' in failing to restore it upon revocation of the authority, although it may not be 'fraud' or an 'embezzlement' or perhaps not even a 'misappropriation'." 9 Am. Jur.2d, *Bankruptcy*, § 801 (1963). *See Fidelity and Deposit Company of Maryland, Inc. v. Lilly, supra*, 1 B.R. at 774.

The Court notes that a defalcation was found to exist upon a finding of a deficit in a fiduciary's account. *In re Newman*, 2 B.C.D. 894 (Bkrtcy. S.D.N.Y.1976). Even a mere failure to account has been held to constitute a defalcation. *In re Burn*, 2 B.C.D. 1299 (Brktcy. E.D.Pa.1976). A misappropriation or defalcation has been established by an insurance agent's practice of using insurance premiums for rent and various other office expenses. *In re Klein*, 3 B.C.D. 638 (Bkrtcy. W.D.Mo.1977).

The weight of the evidence in the instant matter requires a finding that the defendant's action constituted a knowing and serious breach of his fiduciary duty to receive and hold premiums due Union Mutual. Accordingly, the Court finds that the defendant's actions amount to a misappropriation or defalcation within the meaning of Section 17(a)(4).

■ Union Mutual also raises the issue of nondischargeability under Section 17(a)(2) of the Bankruptcy Act which, in pertinent part, provides:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowance in full or in part, except for willful and malicious conversion of the property of another...."

The determinative factor within the meaning of this provision is whether "the act of conversion [was] done deliberately and intentionally in knowing disregard of the rights of another." *Bennett v. W. T. Grant Co.*, 481 F.2d 664, 665 (4th Cir. 1973).[4] Upon a finding that this standard has been met by the injured party, the debt "falls within the statutory exclusion" and must be held nondischargeable. *Id.*

The Supreme Court of Tennessee in *Maryland Casualty Co. v. Fant*, 181 Tenn. 492, 181 S.W.2d 753, 754 (1944) observed

that: " 'the conversion or embezzlement by an insurance agent of the balance of premiums collected by him after deduction of his commissions and expenses has been held to be willful and malicious injury to property within the meaning of the Bankruptcy Act.' Remington, 5th Ed., On Bankruptcy, Vol. 7, sec. 3552, p. 816."

■ In the instant matter, the weight of the evidence establishes that the defendant's conversion of premiums was intentional. There was testimony that the defendant withheld the proper classification of the insureds on the various list bills from Union Mutual; that the defendant failed to promptly remit premiums to Union Mutual; that defendant used a portion of the premiums for business overhead and personal expenses; and that the defendant failed to remit over $60,000.00 in premiums due and owing to Union Mutual. The defendant's explanation for these occurrences—poor bookkeeping, poor administrative help, lack of specific guidelines from either the General Agent or Union Mutual, and poor judgment—while apparent to varying degrees in the record, are not sufficient to relieve him of his responsibilities under the Agent's Contract with Union Mutual.

The Court finds no support for the defendant's contention that Union Mutual, through a course of dealings between the parties, enlarged the defendant's powers or removed incapacities under the Agent's Contract. The defendant's actions, under the circumstances of the present case, were intentional in nature rather than based upon an honest, but mistaken, belief of an alleged acquiescence on Union Mutual's part. *See Davis v. Aetna Acceptance Co.*, *supra*, 293 U.S. at 332, 55 S.Ct. at 153.

---

4. The Tenth Circuit in *Bank of Meeker v. McGinnis*, 586 F.2d 162, 163 (10th Cir. 1978) has construed the phrase "willful and malicious" as follows:

"[W]illful and malicious conduct causing injury to the person or property of another ... does not necessarily mean or involve a malignant spirit or a specific intention to injure a particular person or harm his proper-

ty. A willful disregard of that which one knows to be his duty, or an act which is wrongful in and of itself, and which necessarily causes injury, if done intentionally, is done willfully and maliciously, within the scope of the exception to the dischargeability created by the statute."

*See also Tinker v. Colwell*, 193 U.S. 473, 487, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904).

Union Mutual seeks declaratory relief against the defendant on the basis of a forfeiture clause in the latter's Agent's Contract with Union Mutual. This provision pertains to commissions accrued following the defendant's termination. The defendant's position as a career agent with Union Mutual was terminated by letter dated November 3, 1977. This letter was hand-delivered to the defendant by Wechsler in the District of Columbia on November 4, 1977. By virtue of the defendant's termination under Section 4(d) of the Agent's Contract, Union Mutual alleges that Section 11 of the contract becomes applicable in the instant case. This portion of the contract provides:

"Should the Agent at any time (a) commit any fraud in connection with the Company's business, (b) induce any policyholder to replace in another company a policy issued by the Company, or (c) fail to promptly remit monies collected on behalf of the Company, all commission payments or rights thereto under this agreement or any prior agreement with the Company shall terminate and be forfeited, and this agreement shall terminate upon written notice by the General Agent, his successor(s) or the Company to the Agent."

The defendant contends that the evidence adduced at trial neither establishes fraud nor a willful withholding of funds on his part and, accordingly, the above-referenced forfeiture clause in the Agent's Contract is unenforceable. The defendant further contends, in the alternative, that should the Court determine that Section 11 of the Agent's Contract is enforceable, the language of Section 16 requires that the terms of the Broker's Contract, and not the Agent's Contract, be applied to the resolution of the question at hand, and he still would be entitled to his commissions.

■ It is axiomatic that any ambiguity or uncertainty pertaining to the language used in a contract "should be construed against the party using it." *Scott v. Goode*, 152 Va. 827, 148 S.E. 689, 692 (1929). Although the Court may interpret a con-

tract or resolve ambiguities which may arise from the contract, the Court may not add to or take from the contract. If no ambiguity is found to exist in a contract, the Court must look to the four corners of the document, nothing more nor less.

■ It has been uniformly decided that the right of an insurance agent to commissions on renewal premiums depends upon the contract existing between the agent and the insurer. 43 Am.Jur.2d, *Insurance*, § 187 (1969). The general rule is that unless the agent's contract makes allowance for the payment of commissions on renewal premiums paid by insureds after his termination, he will not be entitled to such commissions after his employment has been rightfully terminated. *V. L. Phillips and Company v. Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Company*, 199 F.2d 244 (4th Cir. 1952) (applying Virginia law) *cert. den.*, 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342 (1953), reh. den. 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953).

■ The defendant's contention that paragraph 16 of the Agent's Contract requires that the terms of the Broker's Contract be applied to the issue of a forfeiture of his commissions on renewal premiums is without merit. Even if the Court applied the forfeiture provision of the Broker's Contract, Union Mutual was empowered therein to terminate the defendant's right to future commissions upon a finding that he willfully withheld funds from it. Admittedly, the forfeiture provisions of the Agent's Contract are broader in scope than under the Broker's Contract. However, the criterion relied upon by Union Mutual— that the defendant willfully failed to remit premium monies—is present in the forfeiture provisions of both contracts.

Although the Agent's Contract speaks to a forfeiture on an agent's right to commissions on renewal premiums upon the breach of various conditions, this is not technically a working of a forfeiture. The Agent's Contract established certain criteria upon which the right to commissions on renewal

premiums depend. As stated in *Boyd v. American National Insurance Co.*, 20 Tenn. App. 631, 103 S.W.2d 338, 347 (1936):

> "The failure of the agent to comply with these conditions placed him without the category in which he could rightfully claim the commissions. It was a continuing condition subsequent. Only so long as he performed the duties and obligations specified would he be entitled to the commissions." [5]

Certainly, the defendant has acquired no absolutely vested right to the commissions in question. It is a contractual right which can be enforced subject to the terms and conditions of the Agent's Contract. Under this view, the forfeiture clause of this contract must be construed as attaching a contingency to, or a limitation upon, the defendant's right to commissions. This is in accord with the opinion expressed in *Masden v. Travelers' Insurance Company*, 52 F.2d 75, 78 (8th Cir. 1931), whereby the agent's "right to commissions on undue and unpaid renewal premiums was an unaccrued, prospective and contingent one" based entirely upon the agent's continued performance of duties under the Agent's Contract.

Assuming the facts as presented in this case are treated as a question of forfeiture, the Court should also look to the criteria set forth in the Agent's Contract empowering Union Mutual to enforce a forfeiture.

 It is a well-established principle that the law will not favor forfeitures. Accordingly, the Court must remain "alert to take advantage of any circumstances that indicate an election to waive a forfeiture, or any arrangement to do so on which a party has relied and acted." *Farmers' Benevolent Fire Insurance Association of Franklin County v. Kinsey*, 101 Va. 236, 43 S.E. 338, 339 (1903). Further, "it is incumbent on the party who seeks to enforce [a forfeiture] to show plainly his right to it." *Philadelphia, Wilmington, and Baltimore R. R. Co. v. Howard*, 54 U.S. (13 How.) 307, 340, 14 L.Ed. 157 (1851).[6]

The defendant asserts that Union Mutual should have exercised a lien under Section 5 of the Agent's Contract permitting the latter to be made whole by setoffs against claimed commissions on premiums. Inasmuch as the defendant has no vested right to claim such commissions, his assertion must be deemed to be without merit. In any event, this lien indebtedness provision apparently is applicable only in a situation where an agent's arrearage may be interpreted as a debt to the insurer. Union Mutual, in the instant matter, was not fully cognizant of the debtor's actions until the November 1977 audit. In order to create a debtor-creditor relationship, the creditor must first acquiesce to the business practices in question of the debtor. Under the facts of the present case, the allowance of late payments and resubmission of checks by the defendant are not sufficient to constitute either a waiver or acquiescence on the part of Union Mutual.

The fact that Union Mutual chose to rely upon the fraud and remittance provisions of Section 11 of the Agent's Contract does not demonstrate any ulterior motive on its part to deny the defendant the benefit of commissions. Rather, the Agent's Contract makes specific allowance for the manner in which Union Mutual may rightfully terminate an agent's commissions upon establishing either fraud or a willful failure to promptly remit premiums by the agent. The weight of the evidence clearly indicates that the defendant did willfully fail to properly remit premiums and, upon Union Mutual's discovery of his actions, the latter promptly terminated the defendant and invoked the forfeiture clause in accordance

---

**5.** The Virginia Supreme Court, in a different factual context, upheld a contractual forfeiture for the breach of a condition subsequent in *Eagler v. Little*, 217 Va. 869, 234 S.E.2d 242 (1977). The conditions subsequent must, however, be created by express terms or clear implication.

**6.** The Agent's Contract, having been drafted by Union Mutual, must be construed most strictly against it. This contract is to be construed in equity so as to avoid a forfeiture, but only if a reasonable interpretation of the language used will so permit.

with the express terms of the Agent's Contract.

Notwithstanding the above-referenced election by Union Mutual, this Court, as a court of equity, has the inherent authority to relieve a party against whom a forfeiture has been exacted. However, the maxim that courts do not favor forfeitures should not be interpreted to preclude the enforcement of a forfeiture provision in a contract which is reasonable according to its terms and conditions. This view finds support in *Neuffer v. Bakery and Confectionary Workers International Union of America*, 307 F.2d 671 (D.C.Cir. 1962). The *Neuffer* court, at 673, held that "[w]here the conditions [in a forfeiture clause] are reasonable and not against public policy, and where there has been no fraud on the employer's part, [there is] nothing inherently illegal in such an agreement." The court in *Neuffer* concluded that "[a]lthough the law abhors forfeiture, it, nevertheless enforces reasonable contracts." *Id.*[7]

There is authority for the view that Union Mutual's election to invoke the forfeiture clause of the Agent's Contract was reasonable under the facts of the present case.

In *Burelson v. Northwestern Mutual Insurance Company*, 86 Cal. 342, 24 P. 1064 (1890), an agency was terminated because of a defalcation in the agent's accounts. The court found that the agent could recover no commissions on premiums after such termination.

A result similar to that arrived at by the *Burleson, supra*, court was reached in *Becker v. Nahm and Turner, Inc.*, 435 S.W.2d 750 (Ky.App.1968). *Becker* involved an action by an insurance agent who sought to recover renewal premiums after his agency had been terminated. The agent was under a duty to submit applications for group accident insurance to the insurer as well as attending to renewals and collecting premi-

ums. The *Becker* court found that the agent was rightfully terminated for his failure to account for and remit premiums to the insurer. In light of the fact that the agent was required to perform a continuing service in the renewal of accident policies, the *Becker* court held that the agent, having no vested right in the commissions was not entitled to them after a just termination of his agency except to the extent his contract provided therefor.

The court in *Phoenix Mutual Life Insurance Company v. Holloway*, 51 Conn. 310, 50 Am.Rep. 20 (Conn.1884) held that an agent does not have such a vested interest in commissions on renewal premiums as could not be divested by his rightful termination because of a shortage in his accounts. Thus, termination for fault by reason of the agent's own misconduct (i. e., defalcation), which resulted in his loss of commissions on renewals of existing policies, was upheld by the *Holloway* court as being valid.

In *Kelly v. American Mine Owners Casualty Corporation*, 161 Va. 206, 170 S.E. 580 (1933), although principally concerned with which party had a rightful property interest in certain "expirations", the Virginia Supreme Court did make a finding that Kelly (an insurance agent specializing in compensation insurance on coal mining operations), who had been terminated because of his failure to promptly remit premiums, was not entitled to "commissions on the gross amount of premiums due when he was discharged." *Id.* at 582. The court reasoned, citing *Phoenix Mutual Life Insurance Company v. Holloway, supra*, that "[c]ommissions are paid for work done." The court in *Kelly, supra*, 170 S.E. at 582, noted further that "[t]his agent had not collected [the premiums in question] and certainly should be paid nothing on their account, and this is doubly true when we remember the conditions under which he was discharged."[8]

---

7. The Virginia Supreme Court in *Newport News v. Doyle and Russell, Inc.*, 179 S.E.2d 493, 496, 211 Va. 603, 607 (Va.1971) held: "[t]he rule that courts do not favor forfeitures ... is never carried to the extent of relieving

parties from the express terms of their own contracts." (citations omitted.)

8. The *Kelly* court, *supra*, 170 S.E. at 581, observed that not only had the agent (Kelly) been

**180**

Other decisions which support this view include *Frankel v. Michigan Life Insurance Company*, 62 N.E. 703 (Ind.App.1902); *Boyd v. American National Insurance Company, supra. See also Sterling v. Metropolitan Life Insurance Company*, 49 Hun. 608, 2 N.Y.S. 84 (1888), *aff'd.* 130 N.Y. 632, 29 N.E. 150 (N.Y.App.1891).

 A court of equity must give effect to a forfeiture provision in a contract which is fair on its face, and is neither unconscionable nor oppressive.[9] If the Court finds, however, that the exaction of a forfeiture is directed toward purposes other than those for which it is meant to apply, equity will not lend its aid to divest an interest by enforcing such a forfeiture. Furthermore, the mere fact that a party is willful in not performing a contract in accordance with its provisions will not necessarily act as a bar to equitable relief. Nevertheless, a court of equity may be constrained to preclude a party from obtaining equitable relief upon a finding of bad faith, fraud, wanton and inexcusable conduct, or other controlling circumstances. *See Campbell v. Alsop's Administrator*, 116 Va. 39, 81 S.E. 31, 33 (1914). *See also* 17 Am. Jur.2d *Equity* § 82 (1966).

The weight of the evidence adduced at trial clearly indicates that there existed a fiduciary relationship between the defendant and Union Mutual, and that the former breached his fiduciary obligation to the latter. A review of the Agent's Contract finds that by its express terms a forfeiture of an agent's renewal commissions would be effectuated upon a knowing breach of a condition(s) stated therein. The defendant has been unable to establish an ulterior motive on Union Mutual's part (or the existence of a so-called "sweetheart" relationship between Union Mutual and use plaintiff, Continental) to deprive him of the commissions in question for any reason other than that provided for in the forfeiture clause of the Agent's Contract. Nor can it be said that the defendant's conduct in withholding the insureds' premiums, commingling them with his own personal funds, and using such premiums for his own personal purposes was that of an innocent or technical converter. It is evident that the defendant's conversion of premiums was intentional and that he, as an agent/broker with twenty-five years experience in the insurance field, knew what he was doing

slow in making remittances to the insurer but that he:

"Sometimes [paid the premiums] ... by checks dated to take effect at some future date, and sometimes payment on checks was stopped. Demands for settlement were continuous and excuses kept pace with them. [Kelly would state that he] was sick, members of his family were unwell, the affairs in the fire insurance department of his business were involved [he used premiums to pay off obligations demanded by other insurance companies which he represented], and business conditions made it impossible to collect premiums as they fell due."

**9.** The defendant contends that the Agent's Contract entered into by him with Union Mutual was in the form of an adhesion contract in that it was prepared by Union Mutual and was signed by him without negotiation of terms (as is apparently the case with all prospective agents). The defendant seeks the interposition of the Court to estop Union Mutual from relying on the forfeiture clause and any benefit therefrom pertaining to the latter's retention of commissions. In order for equity to intercede with equitable relief to prevent an unconsciona-

ble advantage from being taken of the defendant, such advantage must be:

"[U]nder circumstances which mislead, confuse, or disturb the just result of his [the defendant's] judgment, and thus expose him to be the victim of the artful, the importunate, and the cunning, where proper time is not allowed to the party and he acts improvidently, or if he is importunately pressed, if those in whom he places confidence make use of strong persuasions, if he is not fully aware of the consequences, but is suddenly drawn in to act, [particularly] if he is not permitted to consult disinterested friends or counsel before he is called on to act in circumstances of sudden emergency or unexpected right or acquisition—."

7 Am.Jur.2d, *Equity*, § 24 (1966).

Under the circumstances of the present case, it certainly does not appear that the defendant, a person with extensive business and sales experience in the insurance field, falls within the contemplated category of one who could be so misled and, accordingly, it must be determined that Union Mutual's action was not of a nature requiring a finding of unconscionable overreaching by its invoking of the forfeiture clause in the Agent's Contract.

and was well aware of the consequences of his actions.

When a court determines that the defendant's actions constitute and give rise to bad faith on his part, it is precluded from granting equitable relief on the defendant's behalf to preclude enforcement of the forfeiture clause in the Agent's Contract. Any decision rendered by the Court must take into account a principle fundamental to bankruptcy law which is "to give the debtor a 'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970) *quoting Local Loan Company v. Hunt,* 292 U.S. 234, 244–245, 54 S.Ct. 695, 699–700, 78 L.Ed. 1230 (1933). However, this principle must give way in a situation of this nature involving a vital public interest which is "to protect the consuming public which pays its premiums with the expectation that those premiums will be transmitted to the insurance company" without attendant delays or mistaken revocations in coverage owing to an agent's misconduct. *Consumers Life Insurance Company v. Staller, supra,* 4 B.C.D. at 331.

It is undisputed that exceptions to discharge under Section 17(a) of the Bankruptcy Act must be limited to those clearly enunciated therein. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). Accordingly, this Court has no alternative but to find that the defendant is not entitled to the commissions being held for him by Union Mutual or for future commissions which would otherwise accrue to him.