# Wytheville.

## R. E. Scott v. J. C. Goode.

June 13, 1929.

The opinion states the case.

*A. B. Dickinson*, for the plaintiff in error.

*F. C. Bedinger*, and *Sterling Hutcheson*, for the defendant in error.

WEST, J., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Mecklenburg county in favor of J. C. Goode against R. E. Scott, for the sum of $2,097.50.

The suit was instituted by notice of motion for judgment by J. C. Goode against R. E. Scott, to recover compensation for services rendered in securing options from landowners for land which Scott wished to buy, at prices acceptable to him.

On some of the material points at issue the testimony is in sharp conflict, but the judge resolved these conflicts in favor of the plaintiff.

A careful examination of the record satisfies the court that it presents no reversible error. We adopt the opinion of the trial judge, Hon. E. W. Hudgins, as the opinion of the court in the case, as follows:

"This is a controversy involving compensation claimed to be due the plaintiff by the defendant for securing options from the landowners, at prices acceptable to the defendant, on lands lying on both sides of Roanoke river, in Mecklenburg county, Virginia, and in Granville county, North Carolina. The basis of contention hinges in part on the correct construction to be given the following letter, to-wit:

" 'Gentlemen:

" 'Confirming our verbal understanding concerning the acquisition of options on lands required for the Roanoke river project:

" 'You are to proceed at once to endeavor to secure contracts for the sale to me of such lands required for the Roanoke river project as are not yet under contract for cash, and at such prices as may be approved by me. For your services in that connection between now and the 31st day of December, 1926, you are to receive the payment in cash of $500.00 and a commission on all lands contracted for, at prices which may be approved by me, of $2.00 per acre.

" 'This involves the giving by Mr. Goode of his entire time to that work between now and the first day of January, 1927, it being understood that Mr. Turnbull is to give him such assistance as his time and other engagements will permit.

" 'I will furnish you contract form.

" 'Very truly yours,

RES: EW                           " 'ROBT. E. SCOTT.'

"And in part on the verbal statements made later when the scope of the work under this agreement was extended to include lands on Nutbush Creek, in North Carolina, and especially that part of the conversation affecting the land called the 'Hargrove tract.'

"The evidence discloses that Mr. R. E. Scott, of Richmond, Virginia, representing an undisclosed principal, was, on September 21, 1926, and some time prior thereto, engaged in buying up land, taking title in his own name, on both sides of Roanoke river and its tributaries west of Buggs Island. The purpose of these purchases seems to have been to erect a dam across the Roanoke river at Buggs Island in this county, and the land desired was such as the back water caused by the erection of the dam would cover or materially damage. Mr. J. C. Goode owned personally some land which would be submerged when the dam was

erected, and had sold a part or all of his farm to Mr. R. E. Scott prior to September 21, 1926. Mr. Goode is a native of Mecklenburg, and was well acquainted with the people of the county, and thus perhaps was enabled to deal with the landowners more easily than Mr. Scott who was not so well known in this section of the State. Mr. Scott and Mr. Goode talked about buying land which would not be submerged by the back water, but would be damaged or cut off from other lands of the same tract. At any rate, both knew and discussed among themselves:

"(a) The erection of the dam;

"(b) The land that would be submerged or damaged thereby, and the present desire of Mr. Scott to purchase such lands.

"The parties reached a verbal agreement whereby Mr. Scott should employ Messrs. Turnbull and Goode, and on September 21, 1926, Mr. Scott reduced the verbal agreement to writing in the form of a letter addressed to these gentlemen, and set out in full in paragraph No. 1 above, and Mr. Turnbull's reply thereto of September 25th constituted the contract in part between the parties.

"The subject matter of the contract is stated in the opening sentence, namely, the 'acquisition of options on lands required for the Roanoke river project.'

"2. The duties of Messrs. Turnbull and Goode are set out in the following words: 'Endeavor to secure contracts for the sale to me of such lands required for the Roanoke river project—at such prices as may be approved by me.

"3. The compensation for the duties to be performed in connection with the above subject matter is stated in this language: 'You are to receive payment in cash of $500.00 and a commission on all land contracted for, at prices which may be approved by me, of $2.00 per acre.'

"The plaintiff contends that the above contract should be construed to mean that he is entitled to receive the compensation of $2.00 per acre on all lands actually contracted for at prices approved by Mr. Scott, during the life of the contract; and his contentions may be summarized as follows:

"1. That he actually bought the land under direct orders from the defendant, after prices and reports had been made to Mr. Scott.

"2. That he spent more time examining and reporting on lands above highwater mark than below.

"3. That on several occasions he was sent back to examine and report on highlands alone.

"4. That Mr. Chambers was sent a list of land, showing what he had bought, which list was checked over and approved by him.

"5. That Mr. Scott wrote the letter of September 21st, and if there is any ambiguity in the language used, it should be construed against him.

"6. That the duty was on Mr. Scott to inform Mr. Goode that he did not expect to pay him for lands above the contour line.

"7. That the word 'required' in the contract means 'to request,' 'to ask,' 'to entreat.'

"The defendant contends:

"(a) That the plaintiff was special agent, and that his powers and rights to compensation should be strictly construed.

"(b) That the contract is essentially one of hazard.

"(c) That there must be a contract expressed or implied before there can be any recovery.

"(d) That the contract, by its terms, limits compensation to the lands to be actually covered by back water from the proposed dam.

"(e) That an agent cannot recover simply because he aided in the sale or the purchase of property.

"Special agent's contract.

■ "That a special agent's contract for compensation shall be strictly construed, in support of this proposition, the defendant in his written brief cites the following three Virginia cases, to-wit: *Halsey* v. *Monteiro*, 92 Va. 581, 24 S. E. 258; *Bowels* v. *Rice*, 107 Va. 51, 57 S. E. 575; *Seergy* v. *Morris Realty Company*, 138 Va. 572, 121 S. E. 900. An examination of these cases shows that in each instance the controversy arose between the principal and a third party, because of the acts of the agents, and each case deals with the power or authority of the agent to bind his principal. The question before the court in this case is not the authority of the agent to bind his principal, but between the agent and the principal over services performed and whether or not those services were in the scope of his employment.

■ "2. Contract is one of hazard. The court fails to see how the principle, that a broker's contract is one of hazard, helps in the solution of this case. It is universal law that a real estate broker is never entitled to compensation unless he succeeds in procuring a purchaser ready, able and willing to buy, upon terms satisfactory to the seller, or that he has bought property at prices and terms satisfactory to the principal. If we apply this rule strictly, it answers one of the questions raised in this case.

"It seems from the undisputed evidence that a map showing the wash water line by the defendant and a partial list of the landowners were given the plaintiff, either at the time the contract was made or soon thereafter, and he immediately began work. A number of options were obtained and submitted to the defendant; if the plaintiff could not secure an option

on lands that would be flooded, alone, he obtained prices on lands that would be damaged as well as flooded, and sometimes on the entire tract, making a full, complete report in each case. The defendant then exercised his right under the contract and instructed the plaintiff to buy such lands as he chose, at the prices which were satisfactory to him. If the defendant thought the price of any lands reported on was too high, he refused to buy. There is no question of bad faith charged on either side; no complaint is made that the plaintiff ever dealt with and reported to the defendant in any other manner than freely, frankly and fully, or that the defendant arbitrarily refused to buy when the price was reasonable, or what he termed reasonable.

"The defendant emphasizes the fact that the contract is in writing and hence there can be no implied contract to pay for services which may have been beneficial to him; that there was no *quantum meruit* count in the notice of motion. At this stage in the proceedings, the court is endeavoring to arrive at the correct construction to be given a writing. The rule, therefore, that before a party can recover there must be an expressed contract, or the evidence must show such circumstances that the law will imply a contract between the parties, is not very helpful.

"The court must examine the writing, and from it and the circumstances arrive at the true meaning of the language used. It is contended that the words, 'lands required for the Roanoke river project,' mean lands which will be actually covered by backwater when the proposed dam is erected. In the form of the option contract to which the plaintiff was required to obtain the signature of each landowner is found the following:

" 'It is understood that the above mentioned lands are wanted for the purpose of establishing or procuring the establishment of a hydro-electric plant in the county of Mecklenburg, State of Virginia, on Roanoke river, and the construction and operation of a dam which may raise the waters in said river to a height at said proposed dam not exceeding 266 feet above sea level as determined from the bench mark of the United States Geological Survey established at Clarksville, Virginia, the operation of said plant involving the raising and lowering from time to time of the waters back of said dam, as may be deemed advisable by the persons in charge of said plant. And the parties hereto consent to the establishment of such plant and the erection of such a dam, and the maintenance and operation of the same as above indicated, and in the event of the acceptance of this option by the party of the second part, his heirs or assigns, the deed executed pursuant thereto shall contain an appropriate clause granting and assuring to the grantee in said deed, his heirs and assigns, the right to perpetually maintain and operate such a plant and dam, including a clause by which the grantor therein and all persons claiming by, through or under him, shall release the grantee therein and his heirs and assigns, from any damage to the residue of the lands of the party of the first part or persons residing thereon from the maintenance and operation of said plant and dam, as the parties in charge thereof shall deem advisable.'

"Hence the plaintiff was required to obtain (1) a contract to convey the fee simple title to the land which would be flooded, (2) a release from the owner of all damages, not only to the residue of his tract but all lands which he then owned, whether the same will be flooded or not, (3) a release of such damages

as the erection of the dam and the flooding of the lands might cause to the person of the owner and all persons claiming under him, including the occupants or tenants.

"Without passing upon the validity of these releases, their limitation, or interest, but calling attention to the valuable and far-reaching rights which pass from the vendor when such options are accepted, such releases suggest the question of seepage from back-water on lands not covered, stoppage of drainage of the lands above the contour line, sickness of the vendor, his family and tenants which may be caused by stagnant water and the like.

"Bearing in mind the rule that if there is an uncertainty or ambiguity in the language used, it should be construed against the party using it; that the defendant accepted only such options obtained by the plaintiff when the prices met with his approval; that there are valuable rights in lands above the contour line contained in the option; the known object to be attained; the method of the contracting parties in closing the contracts; the court is of opinion that the plaintiff is entitled to compensation on 'all lands contracted for at prices  *  *  *  approved' by the defendant if the plaintiff was the 'procuring cause' or materially assisted in obtaining such contracts.

"It was the understanding of the parties (while not mentioned in the letter) that the original agreement applied to lands in Mecklenburg county, Virginia, only. Later, by verbal arrangements, this contract was so enlarged as to include lands on Nutbush creek, in North Carolina.

"In reference to this tract, the undisputed facts are that Mr. Goode, after several conversations, was told by Mr. Chambers that he could assist in the purchase of the Hargrove tract. Thereupon he called on Mr.

Hargrove and arranged a meeting in Mr. Hicks' office in Henderson, North Carolina. The meeting resulted in the parties reaching a verbal agreement, subject to ratification by Mr. Hargrove's sisters, whereby the land would be sold at forty dollars per acre. Mr. Goode then insisted that the option contract be prepared and signed the following night, fearing, as he states, that after the parties went to church the next day, Sunday, and talked with some of their friends and neighbors, the verbal offer would be withdrawn; so after dark Messrs. Chambers, Lloyd and Goode went to the Hargrove home where the contract was duly signed by all of the vendors at the price satisfactory to Mr. Scott.

"The defendant admits that the Hargrove tract comprises land required and desired for the Roanoke river project, but claims that this tract was expressly excluded when Mr. Goode was authorized to buy the land in North Carolina; and that while Mr. Chambers might have 'let Mr. Goode in on it'—to use the words of the witness—still he had no authority to do so, and that even if Mr. Chambers did let him in on it, Goode had promised to assist in this matter without charge. The defendant's evidence tends to show that Mr. Goode agreed to assist in securing the contract for the Hargrove property for nothing, and indeed one of the defendant's witnesses goes so far as to say that Mr. Goode begged him a number of times to let him assist in closing the Hargrove deal, and gives as his reason for this action on Mr. Goode's part, that the sale of the Hargrove tract would help Mr. Goode in closing contracts for other similar tracts more readily. The reason, however, hardly stands analysis, in view of the statement, which is not denied, that contracts on the smaller tracts were closed at higher prices after the sale of the Hargrove tract became known.

■ ■ "This is a controversy between men of the highest type, and of unquestionable integrity. The burden of proving facts material to the issue is on the plaintiff. The plaintiff himself testified that while the Hargrove tract was in the December conference eliminated, later Mr. Chambers agreed to permit both Mr. Turnbull and the plaintiff to assist in securing the Hargrove land. There is practically no denial of this fact, and if there were, the plaintiff is corroborated both by Mr. Turnbull's testimony and letter of December 10, 1926. So it is established, first, that Mr. Goode did materially assist in the work on this contract, with the knowledge, consent and advice of Mr. Chambers; second, the Hargrove contract was made at a price satisfactory to the defendant; third, that it comprised land required for the Roanoke river project. But the defendant claims that Messrs. Goode and Turnbull were to asist in this undertaking without compensation. On this point the defendant himself testified, and is supported by the testimony of Messrs. Lloyd and Chambers, and is contradicted by the testimony of both Messrs. Goode and Turnbull. Three witnesses for the defendant and two for the plaintiff. Assuming, as the court does, that all the witnesses have stated only what they believe to be true, and are equally entitled to be believed, the court is then forced to look to the surrounding circumstances to see which is the more probably true. The testimony of Mr. Chambers is that the plaintiff agreed to assist in closing the Hargrove contract without expectation of receiving any pay therefor, and gives as his reason that the Hargrove tract is the key to the whole situation on Nutbush creek, yet both Mr. Goode and Mr. Turnbull state that they did not know conditions in this neighborhood, and that they were able to close

contracts prior to the closing of the Hargrove contract at much smaller prices than after the terms of the Hargrove contract became known.

"By letter bearing date December 10, 1926, about a week after the conference, Mr. Turnbull writes Mr. Chambers, in which he calls to Mr. Chambers' attention some of the qualifications of Mr. Goode, and states that 'it (Hargrove contract) will mean something to us.' This language can only mean that Goode and Turnbull expected compensation if they did assist in this matter. Again when Mr. Turnbull thanks Mr. Chambers for letting them in on this deal, Mr. Chambers said nothing about their having agreed to work without pay. The citation of this evidence serves two purposes: It shows that Messrs. Turnbull and Goode expected compensation if permitted to assist in the Hargrove deal, and that in all probability Mr. Chambers was mistaken in stating that they promised to work on the Hargrove tract for nothing. Mr. Scott, in his letter refusing compensation on the Hargrove tract, when the bill therefor was first presented, puts his refusal on ground other than that the plaintiff had agreed to assist in this work without pay. Mr. Scott is a busy man, and has a great number of conferences with various people, and it is possible that his recollection is not so accurate as to details which took place in this one interview. In addition, the improbability of two men, such as Mr. Turnbull and Mr. Goode, insisting, and, as Mr. Chambers says, imploring him, immediately after the conference, to be allowed to work several weeks without any hope or expectation of receiving anything therefor, seems to the court to outweigh the testimony against them. On the whole, therefore, weighing the statements of the witnesses, the documentary evidence, the circumstances at the

time and thereafter, the usual expectation of reasonable men when they work to receive pay therefor, the court concludes that the greater weight of the evidence sustains the contention of the plaintiff on this particular issue.

"Mr. Scott contends that Mr. Chambers had no authority to bind him to pay Goode and Turnbull on the Hargrove tract; that he may have said that he would like to see them 'get in' on the Hargrove deal, but that it was a mere pleasantry, just wishing them good luck, or something of the kind. Mr. Scott was the principal; he was engaging men to assist him in buying lands, answering a certain purpose, an undertaking of some magnitude, and was excluding a small portion of those lands because he had given this particular tract to another man to purchase for him.

"Whatever may have been in Mr. Scott's mind at the time he made the remark, from the past dealing of the parties, and instructions given Messrs. Goode and Turnbull, it seems to the court that they had a right, under all the circumstances, to take Mr. Scott seriously in these remarks, and believe that if Chambers agreed for them to assist in securing the Hargrove contract, and if they did assist, they would receive compensation therefor. Mr. Turnbull in his letter to Mr. Chambers of December 10th stated that they wanted Mr. Chambers to get the credit for closing this deal, and in his letter to Mr. Scott, he modestly gives Mr. Chambers the larger credit, but the facts disclose that Mr. Goode, by his actions, was of material assistance, if not the procuring cause, in closing the Hargrove con-contract, and hence he should receive pay therefor.

"The evidence discloses that the J. T. Lewis land was on the list given the plaintiff by the defendant or some one for him, and that the contract with Mr

Lewis was made by the defendant in his office in Richmond on January 5, 1927; that sometime prior thereto the defendant had written Irby Turnbull seeking the advice of the plaintiff and Mr. Turnbull on whether or not to offer Mr. Lewis $75.00 per acre. These gentlemen advised against making the offer, which advice was followed by the defendant, and by his refusal, at that time, to buy Mr. Lewis' land, he was able to secure the same at a reduction of $12.50 per acre. Both Mr. Turnbull and the plaintiff talked to Mr. Lewis once or twice about selling to the defendant. No other names on the list were taken from the plaintiff without his consent, and on this state of facts the plaintiff contends that he is entitled to recover for the Lewis land. He also contends that he was not to secure contracts, but was only to 'endeavor to secure' them placing much emphasis on the word 'endeavor' as used in the letter of September 21st.

"It is true that in some jurisdictions a time limit in a broker's contract is construed to imply an exclusive right to sell within the time named. This contract is not a contract to sell, but one to buy, land. At any rate, it seems to the court that the weight of authority and the more logical reasoning is *contra*. Hence the court is of opinion that the contract between the parties is not exclusive, and the defendant had a right, himself, to buy the Lewis land without rendering himself liable to pay the plaintiff compensation therefor."

The judgment will be affirmed.

*Affirmed.*