In the Matter of VECCO CONSTRUCTION INDUSTRIES, INC., Debtor.

The NORTHERN VIRGINIA BANK, Plaintiff,

v.

VECCO CONSTRUCTION INDUSTRIES, INC., Defendant.

Bankruptcy No. 79–224–A.

United States Bankruptcy Court,
E. D. Virginia,
Alexandria Division.

March 23, 1981.

Stanley J. Samorajczyk, Fairfax, Va., Hazel, Beckhorn & Hanes, Fairfax, Va., for debtor.

James M. Lewis, Fairfax, Va., Boothe, Prichard & Dudley, Fairfax, Va., for the Northern Virginia Bank.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

The plaintiff, Northern Virginia Bank ("Bank") alleges that the debtor-in-possession, Vecco Construction Industries, Inc. ("Vecco") became indebted to the Bank in the form of a Term Note ($900,000), and a Demand Note ($300,000) dated March 17, 1977. In connection with these notes, Vecco entered into a "Security Agreement" on even date granting the Bank a security interest in Vecco's "real estate at 7809 Loisdale Road, Fairfax County, Virginia, all retentions on non-bonded jobs, inventory and fixed assets now owned or hereafter acquired together with proceeds therefrom . . . ." [1]

---

1. In an order entered on April 8, 1980, the Court determined that the Bank had "a properly perfected security interest in Debtor's real property located at 7809 Loisdale Road, Spring-

The March 1977 notes were consolidated into a single Promissory Note in the amount of $925,000 dated November 15, 1978. In connection with consolidating the March 1977 notes, Vecco and the Bank entered into a Security Agreement and a Loan and Security Agreement Modification, as well as the Consolidation Agreement. The Bank requested and received a security interest in "all contract rights and accounts receivable [then] existing or [there]after arising together with proceeds therefrom" as additional collateral. No new consideration was given to Vecco by the Bank.

On March 14, 1979, Vecco filed a petition under Chapter XI of the Bankruptcy Act. The Bank filed its Complaint for Relief from Stay on June 12, 1979, wherein it asserted a security interest in certain of Vecco's real estate, as well as fixed assets and all contract rights and accounts receivable. In response thereto, Vecco asserts that the Bank's security interest constitutes a voidable preference under Section 60 of the Bankruptcy Act (11 U.S.C. § 96).

■ The purpose of Section 60 of the Bankruptcy Act (11 U.S.C. § 96) is to discourage creditors' actions which might prematurely compel a business to file a petition in bankruptcy. *Yorke v. Thomas Iseri Produce Company*, 418 F.2d 811, 815 (7th Cir. 1969). Under Section 60(a)(1) of the Bankruptcy Act, a "preference" has been defined as:

> "[A] transfer . . . of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

Section 60(b) of the Act provides:

> "Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

■ Section 342 of the Bankruptcy Act (11 U.S.C. § 742) provides that a Chapter XI debtor-in-possession has the same duties and responsibilities of a trustee appointed under the Bankruptcy Act. It is incumbent upon the debtor-in-possession to establish by a preponderance of the evidence each of the elements in Sections 60(a) and 60(b) as constituting a voidable preference. *Aulick v. Largent*, 295 F.2d 41, 45 (4th Cir. 1961); *Moran Bros., Inc. v. Yinger*, 323 F.2d 699, 701 (10th Cir. 1963).

Several of the elements essential for a finding of a voidable preference appear to be established from the record and raise no real controversy. These elements require only summary review.

■ A transfer of property, within the meaning of the Bankruptcy Act, is a necessary prerequisite for a finding of a voidable preference. An assignment of accounts receivable may constitute a transfer "under such circumstances as would give rise to a voidable preference" as security for a pre-existing debt. *Shaw v. Walter E. Heller & Company*, 385 F.2d 353, 356 (5th Cir. 1967). The granting of a security interest by a debtor constitutes a "transfer" under Section 60 of the Act. The action by Vecco of executing a Security Agreement with the Bank on November 15, 1978 (whereby the Bank received a security interest in Vecco's accounts receivable, inventory, furniture, fixtures, equipment, and facilities and retentions on non-bonded jobs) constitutes such a transfer.

■ The November 1978 Security Agreement reached between the Bank and Vecco, which resulted in the giving of a new security interest in accounts receivable to the

___

field, Virginia . . . and inventory and fixed assets then owned or later acquired; provided, however, that, . . . the Court made no findings of fact or conclusions of law with respect to the Bank's alleged security interest in Debtor's retentions on non-bonded jobs, contract rights and accounts receivable."

Bank, established the Bank as a creditor within the meaning of Section 60 of the Act.

 The Bank received new and additional security on November 15, 1978, by virtue of Vecco having granted to the Bank a security interest in the accounts receivable. Vecco contends that since the purpose of the November 1978 Security Agreement was to consolidate the balance then due on the March 17, 1977 term note and the March 17, 1977 demand note the transfer of the accounts receivable constituted the giving of a security interest for an antecedent debt. The evidence indicates that the Security Agreement constituted a restructuring of Vecco's debt load by effectuating a consolidation of the existing indebtedness of Vecco to the Bank at that time. There is no evidence in the record that the Bank gave any present consideration for the additional security yielded up by Vecco.[2] On the contrary, Vecco made a payment of $74,630.85 in connection with the Bank's consent for entering into the Security Agreement.

The payment of $74,630.85, as well as the use of the accounts receivable (with a book value of $4,268,000) as collateral over and above the value of the creditor's collateral, constitutes a diminution of Vecco's estate. As previously noted, Vecco filed its petition under Chapter XI of the Bankruptcy Act on March 14, 1979. The Security Agreement, the New Demand Note, the Consolidation Agreement and the Financing Statements were all dated November 15, 1978. The Financing Statements were recorded on even date. Thus, all of the above-described documents were executed within four months of Vecco's original voluntary petition under Chapter XI of the Bankruptcy Act.

The presence or absence of the remaining elements constituting a voidable preference remain contested by the parties and require resolution by the Court.

The accounts receivable given to the Bank as additional collateral on November 15, 1978 constituted the only unencumbered asset held by Vecco. By taking this additional collateral, Vecco contends that the Bank deprived all other unsecured creditors of any hope of recovery in the debtor's estate as there were no assets free of the Bank's lien. In light of certain testimony elicited from Robert E. Gray, Jr., Senior Vice President of the Bank, Vecco maintains that the Bank is a partially-unsecured creditor. Vecco notes that the Bank placed a liquidation value on Vecco's assets at $713,000, and its Credit Memorandum of October 25, 1978 estimated the deficiency on the Bank's debt as between $145,000 to $300,000.[3]

As stated in *Shaw v. Walter E. Heller & Company, supra,* 385 F.2d at 356, a creditor may be secured only to the extent of the value of his collateral. Vecco takes the position that by taking accounts receivable with a face value of $4,200,000 (and with an alleged minimum real value of $1,260,000) as additional security, the Bank obtained a greater percentage of its claim than any other member of the same class.

 In order for a transfer of property made or suffered by a debtor to be considered a voidable preference, the transfer must be made at the time the debtor is insolvent. Insolvency exists, under the provisions of the Bankruptcy Act, "whenever, the aggregate of his property . . . shall not at a fair valuation be sufficient in amount to pay his debts." Section 1(19) Bankrupt-

---

2. Section 2.1 of the Consolidation Agreement recognizes that no new consideration was to come from the consolidation arrangement, wherein it states:

"The parties hereto understand and agree that this Agreement and the New Demand Note do not represent a new extension of credit by Lender to Borrower but are only a consolidation of the existing indebtedness between Borrower and Lender.

3. The Bank contends that these liquidation values were used only as an estimate of what might be received, if at some future date it was compelled to liquidate assets and take over the collection of the accounts receivable, rather than as reflecting what it felt Vecco, as an on-going concern, would be able to collect in the ordinary course of business. (*See infra* at pp. 874 and 875.)

cy Act, 11 U.S.C. § 1(19); 3 *Collier on Bankruptcy*, § 60.30 (14th ed. 1977). This is the "balance sheet" test for determining insolvency. The application of this test "focuses not on the liquid funds available at the time of a transfer, but rather on the liquidation value of the debtor's assets compared to his current liabilities." *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980).

■ The burden placed on the debtor-in-possession in establishing proof of insolvency on the date of transfer has always been difficult under Section 60 of the Bankruptcy Act. Frequently, there is no direct evidence of insolvency on the critical dates in question. Yet, insolvency need not always be established by direct proof. Rather, it may be " 'proved by the proof of other facts, from which the ultimate fact of insolvency may be presumed or inferred.' " *In the Matter of Entertainment Incorporated*, 375 F.Supp. 390, 394 (E.D.Va.1974) *citing Rosenberg v. Semple*, 257 F. 72, 73 (3d Cir. 1919).

Establishing what a fair valuation of the debtor's assets is at a particular moment in time is not always easily ascertainable. Within the meaning of Section 1(19) of the Bankruptcy Act, "fair valuation has been defined as:

" '[A] value that can be made promptly effective by the owner of property to pay his debts.... [U]nder the 'balance sheet test' of the Bankruptcy Act, 'insolvency' results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and 'fair market value' implies a willing seller and a willing buyer.' " (Citations omitted.)

*In re Perdue Housing Industries, Inc.*, 437 F.Supp. 36, 37–38 (W.D.Okl.1977).

The First Circuit, in *Constructora Maza, Inc. v. Banco de Ponce, supra*, 616 F.2d at 577, observed that when particular assets of

a debtor are not readily susceptible to liquidation within a reasonable period of time, it would be appropriate for their face value to be discounted. Referring specifically to those accounts receivable whose collectibility has been called into question, the *Banco de Ponce* court recognized that such accounts receivable may be discounted to arrive at their fair value. The standard to determine fair value under circumstances requiring a discount may include consideration of "the past record of payment of the obligors, the obligors' current solvency, and the presence or absence of any dispute over the validity of the accounts or debts owed." *Id.*

Qualified opinion testimony may be heard by the Court to determine the fair value which can be realized from accounts receivable. The credibility given by the Court to the opinion elicited from witnesses at trial is always a relevant issue, particularly as it relates to testimony on the ultimate fact of insolvency or in raising inferences thereto. *In the Matter of Entertainment Incorporated, supra*, 375 F.Supp. at 394.

Raymond G. Curry, Chairman of the Board of Vecco, testified that it was his belief that Vecco had maintained a positive net worth during the late summer to early winter months of 1978. Specifically, Curry testified that as of November 15, 1978 he believed that Vecco's assets exceeded its liabilities (based upon the financial statements he had seen) although he acknowledged that only Vecco's accountants would know for sure. It is uncontroverted that the financial statements issued by Vecco during 1978 never showed a negative net worth. It follows, therefore, that in determining whether Vecco was insolvent on November 15, 1978, the Court must resolve whether the financial statements showing Vecco having a positive net worth were an accurate representation of its financial condition.[4]

---

4. These financial statements showed Vecco's positive net worth as being $859,089 in August of 1978; $582,321 in September of 1978; $626,- 888 in October of 1978; $639,850 in November of 1978; and $724,236 in December of 1978.

Listed among Vecco's assets on its September 1978 balance sheet is an entry entitled "accounts receivable due on contracts" in the sum of $4,100,000. It has been stated that where an "account is undisputed but its collectibility is doubtful the courts have tried to determine whether or not it can be collected within a reasonable time, often by inquiry into the obligor's resources or reliance on witnesses experienced in similar business or acquainted with the bankrupt's transactions." 1 *Collier on Bankruptcy* § 1.19[3] p. 126 n. 21 (14th ed. 1974). The Iowa Supreme Court in *Matthews v. Concrete Engineering Co.*, 228 Iowa 493, 292 N.W. 64, 65 (1940), observed:

" 'With respect to accounts the fair valuation is what with reasonable diligence can be realized from their collection within a reasonable time, and the amount as shown on the face of ordinary retail business accounts is not usually their face value, though of course accounts may be such that their face value as a matter of fact is their fair value.' "

There is overwhelming authority to the effect that unless the debtor company is defunct, valuation of its assets "must be made from the vantage of a going concern and that subsequent dismemberment or impossibility to dispose of plant, equipment, inventory, etc. as an entirety should not enter into the picture." 1 *Collier on Bankruptcy, supra*, § 1.19[3] at p. 130.1.

Larry Duke, Controller of Vecco, testified that the item on the September 30, 1978 financial statement listing the accounts receivable in the sum of $4,100,000 would require a discount of thirty percent to ascertain its fair value (i. e., $2,867,000). Various properties and equipment listed on the financial statement, according to Duke, had a value of $900,000. Duke testified that these adjustments gave Vecco a negative net worth. However, Duke acknowledged that this was only an "educated guess." He testified that his estimate of collecting seventy percent of the accounts receivable was based completely on hindsight, and that he did not know whether, in fact, Vecco had collected such a percentage of its accounts receivable over the years.

Richard Sevila, President of Vecco, testified that the accounts receivable listed in Vecco's October 3, 1978 balance sheet in the sum of $4,268,000 required a discount of twenty-five percent to ascertain their fair value. Inventory and materials, having a face value of $544,000 would have to be discounted by fifty percent to ascertain their reasonable value if sold to others in the construction industry. According to Sevila, these adjustments would give Vecco a negative net worth of $700,000.

Sevila testified that similar adjustments made to the November 30, 1978 balance sheet would find that Vecco's total assets amounted to $6,098,114 while its liabilities totalled $6,929,361. He testified further that this condition of negative net worth, as reflected by the adjustments to the face value of the balance sheets, was present without significant or material differences between October 31, 1978, November 15, 1978, and November 30, 1978.

The probative value of the October—December 1978 balance sheets may be somewhat limited with respect to determining whether the Bank had "reasonable cause to believe" Vecco was insolvent. Testimony was had to the effect that the Bank customarily did not receive the previous month's balance sheet until "toward the end of the month" (Gray's testimony), or for at least "a period of two weeks" thereafter (Sevila's testimony). The Bank contends that it did not have in its possession the October balance sheet on the date of the alleged preferential transfer—November 15, 1978. It is apparent that the Bank could not have had the benefit of any later balance sheets. In any event, the November and December balance sheets did show a continuing positive net worth.

The Bank argues that Vecco's analysis of the value of its accounts receivable was not based on a faithful adherence to the "fair valuation" standard. The Bank refers the Court to Sevila's testimony as to why Vecco discounted its accounts receivable to such a great extent.

By Mr. Sevila:

"[I]f someone owed us $100,000 based on the contract, but there was [sic] extras or claims within that may be worth another hundred thousand, it would get down to the point that I needed that hundred thousand dollars cash so badly that I would drop the claim just to get paid so I could meet payroll, and I couldn't afford the attorneys' fees to go after it anyway."

By Mr. Samorajczyk:

Q. "Then based on this experience, is it fair to say that the $4,268,000 [in accounts receivable on the October 31, 1978 balance sheet] would have to be discounted somewhat before Vecco could actually collect it?"

A. "That's correct."

Q. "All right. What would be a fair estimate of the discount based on Vecco's history of collecting in the years prior to this time?"

A. "I would have to say probably 25 percent."

Q. "And what does that 25 percent represent?"

A. "Well, the cost to collect it, the discounts to collect it, attorneys' fees on some, and some of them we couldn't afford to, to get an attorney to do were actually dropped."

Once Vecco's financial position improved, by October 16, 1979 for instance, Sevila testified that the percentage of accounts receivable was excellent—since March of 1979, current work had been collected "almost dollar-for-dollar". The Bank concludes that the discounts given to Vecco's

$4-million in accounts receivable in the fall of 1978 were from the perspective of a "cash-starved accounts payee without resources for collection", rather than that "of a seller willing but not required to sell".[5]

The Bank argues that if Vecco should prevail in having its assets discounted in any computation of a fair valuation of such assets, its liabilities should also be adjusted. Specifically, the Bank takes the position that if a twenty-five percent write-off of accounts receivable is customary within the construction trade, then Vecco's account payable are overstated by twenty-five percent and should be adjusted downward. As reflected in the November 30, 1978 balance sheet, a twenty-five percent reduction in the $3,661,150 in accounts payable could reduce liabilities by approximately $915,000.[6]

The Bank places great emphasis on the brisk business Vecco was operating in the last five months of 1978. In sales volume, August and September 1978 were the best for Vecco in the two previous years. The increase in monthly billings continued in October and November 1978, with each of these latter months exceeding the sales volume of the previous months. In fact, according to Curry, Vecco had its largest gross profit for any single month in November of 1978. Curry testified that numerous new jobs were pending, suppliers were plentiful and work in general was brisk.

In addition to proving that it was insolvent on November 15, 1978, Vecco also must establish, under Section 60b of the Bankruptcy Act, that the Bank had reasonable cause to believe Vecco was insolvent. *Con-*

---

5. Duke's testimony appears to corroborate that given by Sevila to the effect that Vecco wrote off accounts receivable it deemed were uncollectible. Vecco made an allowance for uncollectible accounts receivable that were adjusted downward on its balance sheets for the period August through December 1978, as follows: $10,000 as of August 31, 1978; $250,000 as of September 30, 1978; $260,000 as of October 31, 1978; $10,000 as of November 30, 1978; and $10,000 as of December 31, 1978; for a total of $540,000. Applying the approximately ten percent write-off evidenced on the face of the balance sheets, when coupled with Sevila's es-

timate of a twenty-five percent discount, would yield a loss in accounts receivable of $3.2-million a year on annual billings of just over $13-million.

6. The Bank also argues that the provision made by Vecco for $534,665 in corporate taxes could be reduced significantly as a result of Vecco's accounts receivable being reduced by twenty-five percent. The Bank hypothesis that if Vecco's operating losses reduces its corporate tax rate to around twenty percent, then the provision for corporate taxes has been grossly overstated and should be reduced as well.

*structora Maza, Inc. v. Banco de Ponce, supra,* 616 F.2d at 578. In determining whether an allegedly preferred creditor has reasonable cause to believe a preference will be effected, each case must, to a great extent be decided in light of its own facts, surroundings and circumstances. The Court must first consider what the Bank knew about Vecco's financial condition and then apply the law to its conclusions. *Seligson v. Roth,* 402 F.2d 883, 886 (9th Cir. 1968).

Neither knowledge of insolvency, nor even an actual belief thereof is required under Section 60(b) of the Bankruptcy Act. *Grant v. First National Bank of Monmouth,* 97 U.S. 971, 972, 24 L.Ed. 971 (1878). Insolvency, however, may be inferred from information accessible to the creditor which would put a prudent business person on notice to inquire as to the debtor's insolvency. It is undisputed that where a creditor ignores "a debtor's precarious state of affairs . . . . [he] will be charged with notice of all facts a reasonably diligent inquiry would have disclosed." *Green v. A. G. Edwards & Sons, Inc.,* 582 F.2d 439, 443 (8th Cir. 1978).

It is an unwarranted conclusion to say, in the absence of further evidence, that "the acquisition of additional security by an anxious creditor does of itself show that the creditor had reasonable cause to believe the debtor was insolvent." *In the Matter of Cruff,* 280 F.Supp. 846, 848 (W.D.Va.1968) (garnishment proceeding by creditor). Thus, a mere apprehension or suspicion of insolvency on the part of a creditor is insufficient. The Fourth Circuit in *Everett v. Warfield Mining Co.,* 37 F.2d 328, 330 (4th Cir. 1930) held:

"A creditor may feel anxious about his claim and have a strong desire to secure it or have it paid, and yet not have such belief as the act requires. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by law."

The Bank makes reference to the financial statements given it by Vecco—all of which showed Vecco having a positive net worth. The Bank contends that it relied upon the accuracy of these statements and, therefore, did not have a reasonable cause to believe Vecco was insolvent. However, a creditor may not place undue reliance upon a debtor's financial statement which shows a positive net worth where he actually has knowledge inconsistent therewith. 3 *Collier on Bankruptcy,* § 60.54[1] p. 1079 (14th ed. 1977). Even so, where such a financial statement is given by a debtor to his creditor which indicates a continuing positive net worth, such a representation "is sufficient to negate further inquiry when the creditor is without reason to suspect either the integrity, or the accuracy of the information." *Seligson v. Roth, supra,* 402 F.2d at 887 (assurance of solvency written to appellee by managing partner of debtor's company).

Vecco argues that the Bank placed a value on Vecco's assets at $713,000 and on accounts receivable at $100,000 for liquidation purposes. Vecco contends that these values are indicative of the Bank's lack of faith in Vecco's financial statements. Vecco contends further that Gray, as Vice President of the Bank, gave a "realistic analysis" of the recoverability of Vecco's accounts receivable at thirty percent of the amount of the claims if Vecco continued in business.

After careful scrutiny of Gray's testimony on this point, the Court is of the opinion that Gray was referring to what the Bank might recover should it be compelled to utilize a liquidation value (rather than an on-going business value) on Vecco's assets. Gray's testimony reflected what the accounts receivable might realistically be worth in October and December 1979 were the Bank to collect them. Sevila himself cited the thirty percent figure (on a liquidation basis) in his testimony with respect to the potential value of the accounts receivable in litigation.

It is uncontroverted that the Bank had access to Vecco's books prior to November 15, 1978. Curry testified that one of the Bank's officers, Robert Crowston, examined Vecco's books at least once a month from

June through October 1978. The Bank, by way of Crowston's affidavit, contends that the latter only examined Vecco's books on two occasions prior to November of 1978, to wit: February 1, 1978 and June 9, 1978. The Bank does concede, however, that after November 15, 1978 Vecco's books were examined more frequently.

Curry testified that the Bank was aware that Vecco was behind in the payment of payroll withholding taxes during the summer of 1978 in the amount of $300,000. He also testified that Vecco was indebted to RND, a "labor company that took labor contracts from Vecco", in the amount of $500,000 for payroll taxes. Curry stated that the Bank was aware of this indebtedness as well. Curry testified that he advised the Bank that he needed to borrow additional funds in order to satisfy these debts.

The Bank, through Gray's testimony, acknowledges that it was aware that Vecco owed $100,000 in payroll taxes. While admitting that it was aware of Vecco's payroll tax difficulties, the Bank argues that it "could have reasonably viewed Vecco's reduction of its tax liability from approximately $352,000 in August [of 1978] to $86,000 in September [of 1978] as an encouraging factor." With respect to the RND payroll taxes, the Bank points out that after analyzing the September 1978 balance sheet it considered ninety percent of Vecco's debt to RND as current (i. e., less than thirty days in arrears) with the balance being less than sixty days in arrears.[7]

Vecco maintained a payment agency account ("501 deposit") with the Bank. This account, according to Vecco, was continually overdrawn in September, October and November of 1978.[8] Vecco takes the position that the Bank, if it had exercised due diligence, should have examined the cancelled checks drawn on the account. Vecco contends that from such an examination the Bank could have easily ascertained that Vecco was not making timely payroll tax payments.

Gray testified that the Bank did not customarily monitor 501 deposits, nor was it mandatory under the agency contract for the Bank to do so. He testified that it was possible to monitor 501 deposits, but to do so would be difficult in that it would entail reviewing over 500 checks a month. Gray acknowledged that Vecco's monthly statements showed unpaid payroll taxes. He also testified that as the Bank processed Vecco's checks through the agency account, it was aware that they were "net payable checks." In any event, the Bank contends that for it to investigate Vecco by looking far beyond "positive net worth" statements, merely because of knowledge that Vecco was using net payroll checks, would clearly impose a duty more onerous than that required of a "prudent business person".

7. Reference is made to a "Credit Memo", dated October 25, 1978 prepared by Gray for the Bank. The Memo states in pertinent part:

"[Vecco is] now operating at a profit and having the best billing months in two years. [However], [t]he drain on working capital resulting from the 1977 losses looms heavily at the present time making it very difficult to sustain this operating level and satisfy accounts payable and other debt[s]."

The Memo also states "that the Bank or other creditors may reach a decision at some point in the future that this is not an on-going business, or Vecco or other creditors may feel [its] best interest will be served through Chapter XI [of the Bankruptcy Act.]"

The Bank counters that Gray never discussed the possibility of a Chapter XI proceeding with Curry (as Vecco contends) prior to November 15, 1978. The Bank states that the Credit Memo merely reflected the Bank's customary procedure in considering any loan (i. e., whenever a client is less than a strong credit risk, the Bank analyzes the client's credit worthiness "in its best, worst and most realistic lights." The Bank maintains that the discussion of a Chapter XI proceeding merely expressed what the Bank considered a worst-case scenario.

8. Vecco also contends that the Bank was placed on notice as to its financial difficulties in the fall of 1978 by the fact that the Bank was allegedly knowledgeable of Vecco's attempt to sell a portion of its stock to Aeromaritime, Ltd., in an effort to pay off back payroll taxes and make back payments to the Bank. The Bank, through Gray's testimony, denies that it was fully aware of the details of the Aeromaritime negotiations. The Bank contends that it was "unable to learn the reasons behind Aeromaritime['s] and Vecco['s] failure to conclude an agreement."

■ The Court recognizes that a creditor need not "make inquiries which could only appear necessary after he has the hindsight of later events." The Court must give "[d]ue regard ... for what is common business practice,—the standards of the 'prudent business person' should not be unrealistic." *Security-First National Bank of Los Angeles v. Quittner*, 176 F.2d 997, 998–999 (9th Cir. 1949). The Court is of the opinion that to require the Bank to investigate, monitor and examine regularly Vecco's 501 deposits would have exceeded the scope of the "prudent business person's" duty to inquire.

■ An objective overview of all the evidence reveals that the Bank clearly was not unmindful of Vecco's financial posture. Unlike the creditors in *Matter of PRS Products, Inc.*, 574 F.2d 414, 417 (8th Cir. 1978) (inability of creditor to procure any financial statements of debtor subsidiary company after numerous requests were rebuffed by explanation that only a prospectus was available) and *Green v. A. G. Edwards & Sons, Inc., supra*, 582 F.2d at 443 (failure of broker-dealer to procure most recent financial statement despite knowledge of monthly trial balances), the Bank asked for and received up-to-date financial statements which it reviewed and from which it could and did make further inquiry pertaining to the facts contained therein. The Court finds that the financial statements in question accurately reflected that Vecco had a positive net worth. Accordingly, upon the facts available to it, the Bank cannot be said to have had reasonable cause to believe that Vecco was insolvent, in the bankruptcy sense, on November 15, 1978.

The Court must conclude, therefore, that Vecco has failed to establish, by a preponderance of the evidence, that it was either insolvent on the date of the alleged preference given the Bank or that the Bank had reasonable cause to believe that Vecco was insolvent on said date.

The Court must next determine whether the Bank's security interest in non-bonded retentions is restricted to those in existence on or before the execution of the March 17,

1977 Security Agreement between the Bank and Vecco, or whether the Bank's security interest includes those non-bonded retentions acquired after March 17, 1977.

Virginia Code Section 8.9–108 (1965 Added Volume) provides that a security interest in "after-acquired property" is deemed to have been taken "for value", rather than "as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement...."

■ In addition, any or all obligations set out in a security agreement may be secured by after-acquired collateral in Virginia. Va.Code § 8.9–204(1) (1980 Cum. Supp.). However, no security interest may be enforced or attached until the debtor has rights in the collateral. 3B Michie's Jur., *Commercial Law*, § 99 (1976 Replacement). It is left to the courts to determine when a debtor acquires rights in the collateral in question. *Id.*

The Bankruptcy Act is controlling as to what constitutes an antecedent debt. Although the Bankruptcy Act does not itself define the phrase "antecedent debt", the definition of this phrase utilized under Section 9–108 "should be regarded as generally accepted and in accord with current business practice and understanding and hence applied in bankruptcy." *Rosenberg v. Rudnick*, 262 F.Supp. 635, 639 (D.Mass.1967).

■ The intent of a debtor to grant a security interest in after-acquired property must be determined from the language of the agreement itself. *National Cash Register Company v. Firestone & Co., Inc.*, 346 Mass. 255, 191 N.E.2d 471, 473 (1963).

■ Vecco argues that the Bank's security interest in non-bonded retentions was restricted to those in existence on or before March 17, 1977, and did not include those acquired after March 17, 1977. The March 1977 Security Agreement grants the Bank a security interest in:

"All retentions on non-bonded jobs, inventory and fixed assets now owned or

hereafter acquired together with proceeds therefrom including but not limited to the attached December 31, 1976 depreciation schedule.

Although Vecco acknowledges that the Bank "restated" and "reaffirmed" the March 1977 collateral in the November 15, 1978 Security Agreement, Vecco contends that the Bank set out the terms of the security covered in the later Agreement in a different manner with respect to non-bonded retentions". Vecco argues that the phrase "all retentions on non-bonded jobs now existing or hereafter arising" is distinguishable from the phrase "now owned or hereafter acquired" which follows "inventory" and "fixed assets" (i. e., furniture, fixtures, equipment and facilities), and, further, that this distinction was intentional and, as such lends support to its position that retentions arising after March 17, 1977 were not included in that Agreement.

Vecco correctly states that any ambiguity in the documents in question must be construed against the Bank since the latter party drafted said documents. *Scott v. Goode*, 152 Va. 827, 148 S.E. 689, 692 (1929). However, ambiguity in the documents must in fact exist before Vecco may benefit from such a judicial construction.

The Bank urges the Court not to accept so narrow a reading of the Security Agreement. It contends that the phrase "now owned or hereafter acquired" modifies all the language which precedes it (i. e., "non-bonded jobs" and "inventory"), not just "fixed assets". The Court is of the opinion that a proper application of the rules of grammar and legal principles enunciated herein would dictate a finding that the phrase "now owned or hereafter acquired" does modify and include non-bonded retentions.

The Bank further contends that the phrase "now existing or hereafter arising" utilized in the November 1978 Agreement (modifying the phrase "non-bonded retentions") although slightly different from the language used in the March 1977 Security Agreement does not amount to a transfer of new security, but rather is only a clarification that a different author thought appropriate.

In support of its position, the Bank refers the Court to *In re Newkirk Mining Co.*, 1 U.C.C.Rep.Serv. 468 (E.D.Pa.1962) where the court construed a "now or hereafter acquired" clause in a security agreement. The court held that such a clause must apply to all after-acquired office furniture and fixtures, even though they were not expressly stated in the security agreement (i. e., "all other buildings, machinery, equipment and inventory" to which the "now or hereafter acquired" phrase most directly modifies). The court in *Newkirk Mining Co.* concluded that it had:

"[N]o trouble in finding that this petitioner's security interest in "equipment" and "inventory" extends to after-acquired "equipment" and "inventory" under the explicit provisions of the Agreement itself, and that the description of the property contained in Exhibit A of the Security Agreement includes furniture and fixtures. This will include all after-acquired office furniture and fixtures."

The Court notes that Vecco gave the Bank data on accounts receivable that made provision for retention on non-bonded jobs after March 17, 1977, as well as before with no differentiation being highlighted. No reference is made in the record as to why data on the non-bonded retention after March 1977 was made available to the Bank in the manner done so by Vecco. The Bank maintains that Vecco's failure to separately categorize non-bonded retentions received after March 17, 1977 (which the former now contends is beyond the scope of the Security Agreement) is further evidence that Vecco's presently asserted interpretation of both security agreements is at odds with the parties' original intentions.

The Court finds that the Security Agreement, Consolidation Agreement and the Loan and Security Agreement Modification dated November 15, 1978, accurately restated and reaffirmed the Bank's security interest in the collateral described in the March 17, 1977 Security Agreement, and

that there is no ambiguity relating to the extent of the Bank's security interest in said collateral. Accordingly, the Court holds that the clear intent of the parties was to give the Bank a security interest in the non-bonded retentions acquired by Vecco after March 17, 1977, as well as on and before even date. The Court further holds that Vecco's granting of a security interest in the accounts receivable and contract rights to the Bank on November 15, 1978 did not constitute a voidable preference under Section 60 of the Bankruptcy Act inasmuch as Vecco did not establish, by a preponderance of the evidence, that it was insolvent on even date or that that Bank had reasonable cause to believe it was insolvent.